And our sixth and final argument of the morning is one that's remote. And that is Albert, yeah we have, can everybody hear me okay remotely? Okay, Appeal Number 21-2592, Danielle Albert v. Commissioner of Social Security. And Ms. Young, good morning, we'll begin with you. Good morning, may it please the court, my name is Anne Young and I represent the appellant plaintiff in this case. This case is about a young girl who has, she's on the autism spectrum, she has Asperger's, ADHD, epilepsy and migraines. She's never had a full-time job, she has never lived away from her parents, she's never had a license and does not drive. There are a couple issues primarily in this case that I want to focus on. The first one is that the ALJ improperly found Dr. Wade, the consulting psychiatrist's opinion, partially persuasive and partially not persuasive. The other issue is in the RFC, the ALJ mischaracterized much of the evidence and improperly discounted other evidence. So focusing on Dr. Wade, she is the most qualified examiner of record here because she is a psychologist and she is the only examining psychologist of record. The ALJ found her opinion to be partially persuasive and partially not persuasive. The ALJ found that the claimant had an impaired ability to sustain efforts of daily activities as persuasive, but then found that the claimant needed support from others to sustain those efforts as not persuasive. So that in and of itself is illogical that if one has an impaired ability to sustain efforts, they therefore would need some assistance to sustain those efforts. And by doing so, the ALJ was to find that portion not persuasive. The ALJ said that it was not consistent with the record. The ALJ focused on several things. She focused on the individualized education program, which was through special education for the claimant when she was in high school. But the ALJ looked at only the positive things in that evaluation, not the negative things, which are throughout the evaluation. For example, the IEP specifically said that the claimant would need some assistance from family members to live independently. That is completely consistent with what Dr. Wade said. Can I pause you on this point? Because I think you have your finger right on the heart of the appeal. And that is this. There's no question that Dr. Wade opined as you describe the opinion. No doubt about it. We can read it that way. The question I have, though, is how does the finding, the opinion, if you will, that Ms. Albert needs some support from others to accomplish the daily tasks of living, when read in the context of this record, show disability? Because we have some idea of what that support entails from day to day, do we not? We have her parents, we have her, medication, some of the dining, eating in the home, matters of personal hygiene. But how does that show an inability to perform any work? It definitely shows that she needs support with daily activities. But you've got to go further than that. Right. Yes, and that's a great question, because accommodated work is not competitive work. And what this IEP shows and what needing support from others during daily activities show, that she needs accommodations. So a lot of the accommodations in the IEP were things like extra breaks, where it was allowed to do exams orally if she needed to, exams one-on-one. She needed more immediate supervision, specifically was noted in the IEP, and she needed more supportive efforts. And all of that suggests that she even took a class that was a basic skills and development class. So the fact that she even needs a class about basic skills is a sign that she needs help with these daily activities. And that equates to accommodated work. There's no evidence that she's able to sustain work on a full-time basis without these accommodations. But do you read the ALJ to have reached a contrary conclusion? Because the RFC allows for only simple and routine repetitive tasks, observing that Ms. Albert can only maintain attention and concentration in two-hour segments. So why doesn't the RFC accommodate exactly what you're describing? So the ALJ found the portion of Dr. Wade's opinion that she needed support from others to not be necessary to include in the RFC. Additionally, in the RFC, it says could respond appropriately to occasional predictable changes in the workplace. Well, this is a girl who was given notification if there was a fire drill at school because she's unable to prepare herself for those things. She needs a constant routine. Dr. Wade discussed that, that she's anxious about events outside her normal routine. In the IEP, it said Danielle is very routine and does best if she can discuss things ahead of time. So the very instance that she needs to be told that there's a fire drill coming so that she can prepare herself and adjust to her routine is an example that she cannot respond appropriately to changes in the workplace. Additionally, Dr. Yoder stated that Danielle Albert is disabled due to autism, and the ALJ did not discuss that whatsoever in the opinion. Hold on, who's her father? Is that? I'm sorry, no, Dr. Yoder is her primary care physician, and he stated she was disabled due to autism. And that supports the IEP, and that supports Dr. Wade's evaluation, and that supports the testimony of the claimant's parents. All of these things are supporting each other, and they were not discussed by the ALJ. Additionally, the claimant has been to Northeastern Center, which is a counseling facility, once, and she presented with healing marks on her arms where she used to self-harm. That information was also not discussed by the ALJ, and it was specifically discussed at the Northeastern Center records in regards to how she manages her anger. She self-harms as a result of managing her anger. That is also significant evidence that was not discussed by the ALJ, which supports Dr. Yoder's statement that she is disabled due to autism, and supports the IEP, and supports Dr. Wade's initial statements that she needs support from others to accomplish daily activities. All of that should have been looked at as support, and Dr. Wade's statements should have been included in the RFC. With that, I'd like to save the remainder for rebuttal, if I can. Sure, of course you can. We'll shift over to Mr. Mervis. Good morning. We'll hear from you. Good morning. May it please the Court, and thank you for the indulgence in appearing remotely. I appreciate it. My name is David Mervis on behalf of Acting Commissioner Kijikazi. We'd ask that this Court affirm the decision of the District Court that the ALJ, the decision in this case, was supported by substantial evidence. Now, what I'd like to do, I think, is take a step back and identify what I think is a contested theme, but it's a theme that's running through Ms. Albert's brief, and that is that this Court and the District Court below should reweigh evidence that the ALJ already considered and discussed. Certainly that's not what Ms. Albert says, but I think that when this Court, and certainly when the District Court, looked at the arguments and what the ALJ actually said, the District Court came away with the conclusion that this is all evidence that the ALJ discussed. Just this year, Your Honor, Judge Scudder issued car v. sol and articulated the oft-articulated position that even if reasonable minds can disagree on the weight that certain evidence should be given, this Court and the Reviewing Court won't substitute its judgment for the ALJ's. And that's, I think, what this case is about. So a couple of examples. We're certainly happy to talk about each of them in more detail. We've got Ms. Albert herself. She testifies at the hearing about a great deal of activities that she engages in. She's involved in, when she was in high school, she's involved in a theater program. She has a great number of hobbies, cooking, baking, photography, knitting. On the other side, you've got testimony from her parents. Her mom and her dad testify that she is inattentive and that she has problems and that she needs to be reminded of things. Of course, even within that piece of testimony, Ms. Albert's mother herself testified. This is at page 63. She testified that, well, when Ms. Albert is interested in the tasks, she can complete them. I think that's telling. I think Ms. Albert is, there's no question that she's got limitations. She's got an IEP that is undisputed. And as Your Honor Judge Scudder noted, the RFC in this case, the residual functional capacity, is limited. So the ALJ notes that she has problems with complex tasks. There's a reference to, in the IEP, that she may need to help with completing things like taxes, like balancing a budget. Not work preclusive. These are things that may well give an adult problems. They don't necessarily mean that the individual is disabled. So we've got, as you talked a little bit about, the IEP. The ALJ has to discuss that. The ALJ does. The ALJ notes that the IEP indicates that she's a reader, that she's participating in the Spell Bowl, that she's completing her assignments. The ALJ says specifically, what this tells the ALJ is that in the school environment, this is at page 26 of the record, in the ALJ's decision. In the school environment, Ms. Albert is able to handle the stress that she perceives in an appropriate manner. So what do you see in the RFC? Well, you see limitations designed to limit the amount of stress that Ms. Albert is asked to deal with. We've got a specific statement at page 27 of the ALJ's decision saying, the limitations that I've included are designed to restrict the emotional stressors that would aggravate Ms. Albert's symptoms. That's the bottom of page 27. So the ALJ is well attuned to these issues. It's just a question of Ms. Albert sees some of these pieces of evidence as more limiting or as supporting additional limitations than the ALJ did. And that's not for Ms. Albert to say, and that's not for this court to say. It's the ALJ, because the ALJ certainly considers the limitations that are present here. The ALJ considers what Ms. Albert's parents say about her inattentiveness, her inability to complete tasks when she's not interested. She has ADHD, there's no question. But the ALJ also considers the way that she can handle these stressors, the way that when she's engaged that she can complete tasks like baking, like photography, like knitting. The ALJ's responsibility is to weigh that evidence, to resolve these conflicts, and that's what the ALJ did in this case. I had gone to class because I was going to return just a moment to the IEP. I'd invite the court to start to look closely. We've obviously discussed it in our briefs, and we're talking about it here today. But the IEP contains a number of very specific statements as to what Ms. Albert's able to do, what she's demonstrated in this environment that certainly is not a work environment. But she's 19 years old, and so this is the best that we've got at this point. We've got evidence that she is volunteering, that she's in this theater program, that she's in this spell bowl. Her English teacher says she has good writing skills. This is at 307 of the record, that she likes to write, that she provides a lot of detail. Again, these are all statements from her teachers who see her on a daily basis, who indicate what she's able to do in this environment that is the most work-like that we've got in the record. So we talked – Ms. Albert focuses a lot on Dr. Wade, so that's a consultative examination in January 2018. The timing is significant here because what happens in this case is Ms. Albert suffers a seizure in late 2017, in September. She goes on a new medication, Keppra, and the record demonstrates that she had some difficulty adjusting to that medication. So in January 2018, she's still experiencing significant side effects from that medication. That's reflected in Dr. Wade's report, but it's also reflected in Dr. Yoder and Dr. Bultemeier. That's the neurologist who's managing her medication for the seizure disorder. So Dr. Yoder says that, well, she's not doing well. This is in January 2018, but I'm expecting some improvement when she gets off this Keppra, and that's at 386 of the record. And what do we see? Sure enough, in two months, she sees her neurologist, Dr. Bultemeier. At page 412 of the record, Dr. Bultemeier says, quote, the old Danielle is back. So she's adjusted, and she isn't having side effects from the Keppra any longer. So she's adjusted to this new medication that is – that there's no question caused her problems at the outset of her period that this court is reviewing, that the ALJ was reviewing. But more specifically, more importantly, the January 2018 consultative examination, that occurs at a relative low period, a low point. But again, when we look at the records that come before, those are what are contained in the IEP, and we look at what her neurologist says a couple of months after that opinion from the consultative examiner, we see improvement. We see a heightened level of performance when she's in school. We see improvement after she gets settled on the medication. So again, there are numerous examples. What this case comes down to is weighing evidence, this piece of evidence versus that piece of evidence, even within this piece of evidence. So you've got the IEP, and you're comparing that to the parent statements. You've got Dr. Wade's statement as compared to the IEP, to Ms. Albert's own statements, to Dr. Bultemeier's statement a couple of months later. This is uniquely the province of the ALJ. Fact-finding is subject to great deference, and weighing of conflicts in the evidence is, of course, subject to deference. That's what the ALJ is responsible for. That's what the district court correctly recognized was at issue here. And for those reasons, we'd ask that this court, like the district court, affirm the final decision of the commissioner. Very well. Thank you, Mr. Mervis. Ms. Young, you have some rebuttal time left, about two and a half minutes. Thank you. I just want to be clear, we're not asking to re-weigh the evidence. An ALJ cannot ignore entire lines of contrary evidence, and that is exactly what the ALJ did in this case, specifically with Dr. Yoder's opinion that Danielle is disabled due to her autism, and the IEP, which specifically stated that she should be on vocational rehabilitation services. In addition to that, as we went over briefly, and as detailed in the brief, is the IEP talked about how she needed immediate supervision, how she had more success when she had this supervision, how general education accommodations would not be supportive enough for her. Also, I wanted to talk briefly about the testimony of her parents. Opposing counsel discussed her hobbies, the claimant's hobbies. Hobbies do not equate to the ability to sustain full-time work, and everything that she does is under the watch of her parents because she lives with her parents and always has. They manage her medications. Both parents are professionals. Her father is a staff accountant. Her mother is a probation officer and has a background in mental illnesses, likely with her clients, but also she was a special ed teacher for five years, so she understands where this is coming from. Her parents specifically stated that they had all kinds of examples about how she would just get in a car with somebody if they were going to Barnes & Noble without realizing what that means because she has no concept of the world. They might have a gun, but if they say we're going to Barnes & Noble, she'd get in the car and go. When she goes to cross the street, she looks both ways because she knows that's what she's supposed to do, but she doesn't comprehend what she's looking for. Her father discussed that she's not observant at all, and she's supposed to take care of her dog, but she just doesn't let him out sometimes, and he poops in her room. He stated that she walks in the poop and then walks around the house, and then she's tracking poop and just doesn't realize it. Her parents have to claim it. You have to go clean up after your dog. These are just a lot of examples, and I just want to touch briefly on the epilepsy issue. She's no longer on Keppra, as the opposing counsel stated, but the ALJ discussed that her seizures are well-controlled when she's on Keppra and when she's compliant with Keppra, but she is no longer on Keppra. Thank you. That is all I have. Okay, Ms. Young, thanks to you. Thank you. Mr. Mervis, thank you. We'll take the appeal under advisement. That concludes this morning's arguments, and the court will stand in recess.